**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| ZELLNER D. BROWN, III | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:11-cv-098-LJM-TAB |
| | ) | |
| METAL WORKING LUBRICANT, | ) | |
| | ) | |
| Defendant. | ) | |

### Entry Discussing Motion for Summary Judgment

Zellner D. Brown brings this employment discrimination complaint against Metalworking Lubricants Company ("Metalworking") alleging that he was subjected to a racially hostile work environment and that he was constructively discharged. Metalworking moves for summary judgment and Brown has not responded.

### Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in his favor. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). AThe nonmovant will successfully oppose summary judgment only when it presents definite, competent evidence to rebut the motion.@ *Vukadinovich v. Bd. of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002) (internal quotation and citation omitted). *See Fed.R.Civ.P.* 56(c)(1)(A),B)(both the party Aasserting that a fact cannot be,@ and a party asserting that a fact is genuinely disputed, must support their assertions by Aciting to particular parts of materials in

the record,@ or by Ashowing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.@).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994). However, "before a non-movant can benefit from a favorable view of the evidence, it must show that there is some genuine evidentiary dispute." *SMS Demag Aktiengesellschaft v.Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009).

Brown has not opposed the motion for summary judgment. The consequence of this is that he has conceded the defendant's version of the facts. *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921-22 (7th Cir. 1994). This does not alter the standard for assessing a Rule 56(a) motion, but does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn,* 129 F.3d 419, 426 (7th Cir. 1997).

### Facts

Consistent with the foregoing, the following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Brown as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

All Metalworking employees are required to sign Plant Rules that are designed to "provide a safe and desirable place to work." Among other rules, employees are strictly prohibited from "threatening, intimidating, coercing, using derogatory or abusive language toward, or harassing any employee or member of management." Brown received a copy of these rules on more than one occasion. Brown understood that if these rules were violated, he could report such violation to his supervisor or any other member of management.

Brown began working for Metalworking as a painter in September 2008. As a painter, he was responsible for painting Metalworking's facility, both inside and out. In February 2009, Metalworking laid Brown off along with a number of other employees. Of those employees laid off in February, Metalworking recalled approximately ten or eleven in June 2009. Brown was one of the employees Metalworking recalled. After the layoff, Brown ultimately returned to his original position as a painter.

Shortly after he was rehired in June 2009, Brown discovered that someone had written a non-racial, derogatory comment on his time card. Brown reported the incident to Dr. Robert Kainz, a senior management consultant for Metalworking. Brown, however, did not know who had written the comment on his time card. Kainz told Brown that if he learned any additional information about the incident, he should report it to him. Kainz also took pictures of the card, made a photocopy of the card, and attempted to match the handwriting on the card to that of other Metalworking employees. Kainz was unable to determine who had written on the plaintiff's time card. At the time of the incident, Brown did not allege or suggest that the derogatory comment on his time card was racially motivated. No other employees, including Metalworking's other African-American employees, had any derogatory comments written on their time cards.

In early 2010, Brown reported to Gary Baize, the Indianapolis Plant Manager, that over the course of a few months, his time card went missing on three or four occasions. Metalworking immediately replaced Brown's time card and conducted an investigation. Brown indicated that he did not have any ideas or information regarding where his time card had gone. In the end, neither Metalworking nor Brown was able to identify any suspects. Brown did not allege or suggest that his missing time card was racially motivated.

During this time period Brown made a number of other complaints – that another employee was putting his clothes or work boots in front of his locker, that a name had been written on his locker, that his lunch had been taken out of the refrigerator and that someone had placed a dead mouse in one of his work boots. Metalworking responded to each of Brown's complaints. Specifically, Baize spoke to the employee who had left clothes in front of Brown's locker and the situation did not occur again. Metalworking was unable to determine who had written on Brown's locker, but did immediately clean the offending comment off of the locker. Neither Metalworking nor Brown knew who had taken his lunch from the refrigerator or who may have placed a mouse in his boot. At the time these events occurred, Brown did not suggest that any of these incidents were racially motivated — instead he indicated that they might have been the result of what his co-workers perceived to be preferential treatment Brown received from management.

On June 28, 2010, Brown reported to management that his locker had been "kicked in." Both Kainz and Baize investigated the locker incident. Brown indicated that he did not know who had kicked in his locker and did not suggest that this incident was racially motivated. No other African-American employees had any issues with their lockers being kicked in. Kainz held a group meeting with all of the Indianapolis facility employees to discuss the fact that destruction of personal property and continued horseplay would not be tolerated. Kainz had noticed an increase in horseplay among all of Metalworking's employees and determined that the situation needed to be addressed.

On July 8, 2010, Brown was involved in an incident that led to discipline for three employees. Brown and one of his fellow co-workers, Robert Jones, were heading into the break room. Brown and Jones went into the bathroom to clean up. When they came out of the bathroom, Bryan Davis, one of plaintiff's friends and co-workers, was standing there with an empty black salt bag over his head. He was apparently trying to play a practical joke on Brown by acting like a Ku Klux Klan member. Metalworking's investigation revealed that when Brown saw Davis wearing the salt bag, he laughed. When Davis removed the salt bag, Brown requested that he put it back on so that he could take a picture. Metalworking's investigation revealed that as Brown took the picture, he stated "this is going to be a $100,000 picture." Brown denies that he laughed upon seeing Davis and instead alleges that he told Davis that his behavior was not funny to him. Brown admits that he asked to take a picture of Davis and that Davis allowed him to do so. Brown denies that he indicated that "this is going to be a $100,000 picture." Prior to the incident on July 8, Brown and Davis were friends and never had any problems with each other.

Brown did not report the salt bag incident to anyone at Metalworking until two weeks after the incident. On that day, he went to one of his supervisors, Mr. Guilfoy, and told him what took place. Guilfoy immediately notified Kainz and Baize. Kainz, Baize, and Guilfoy immediately met with Brown regarding the incident. Brown refused to tell Metalworking that it was Davis who placed the salt bag on his head because he did not want to get Davis into trouble. Metalworking moved forward with its investigation. The next day, the company engaged outside counsel to interview all employees who may have possessed any relevant information. The company began its interviews with Brown who once again refused to identify the employee who placed the salt bag on his head. The next day, however, Brown admitted that it was Davis. During its investigation, Metalworking confirmed that Davis was the individual who had placed the salt bag over his head. Metalworking, however, did not end its investigation upon making that determination — it continued its employee interviews to determine whether there was any other inappropriate conduct or behavior taking place in the workplace.

During its interviews, three other employees admitted that they had occasionally used the "N" word as part of misguided joking in the workplace. None of the three employees, however, ever directed the term toward Brown or any other African-American employee. As a result of its investigation, the company took immediate disciplinary action against the offending employees. Metalworking terminated Davis' employment. Metalworking also suspended, for one week without pay, the two employees it discovered had used the "N" word in the workplace on a couple of occasions. Metalworking also suspended, for two days without pay, the third employee, who admitted to using the "N" word on one occasion. Metalworking took these actions in order to send a message that racially insensitive or motivated conduct or words, whether joking or not, will simply not be tolerated. Metalworking also hired a diversity consulting firm to conduct diversity and sensitivity training for all of its employees and management personnel at the Indianapolis facility. The training included educating the workforce on bias awareness and relationship

building and preparing company leadership to address workplace conflicts related to diversity and inclusion. Metalworking required attendance for all employees, including management personnel, at the training session. Metalworking told Brown to immediately report any issues to management and advised Brown that Guilfoy would act as his immediate liaison for any issues that may arise.

Following the incident with Mr. Davis, Brown complained that his painting of the facility was being sabotaged by individuals putting their "handprints in the paint." Brown was never able to identify who was allegedly sabotaging his painting. Metalworking promptly investigated plaintiff's complaint. Metalworking was unable to determine if the painting was being disturbed and, if so, by whom. Guilfoy continued to act as Brown's immediate liaison for any additional issues that might arise. Brown voluntarily turned in his resignation on September 22, 2010. He gave Metalworking no reasons for his resignation.

## Discussion

Brown alleges two claims based on these events: (1) hostile work environment and (2) constructive discharge.

### A. *Hostile Work Environment*

To make a *prima facie* case of a hostile workplace, Brown must show that (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir. 2010) (gender); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (gender); *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 634 (7th Cir. 2009) (race).

Here, Brown's hostile work environment claim fails the fourth element of this test because there is no basis to hold Metalworking liable. An employer is liable for a hostile work environment caused by an employee only if it was negligent in discovering and remedying the harassment. *Bombaci v. Journal Community Pub. Group, Inc.*, 482 F.3d 979, 983-84 (7th Cir. 2007); *see also Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) ("An employer satisfies its legal duty in co-worker harassment cases if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees.") (internal quotation omitted). Here, Metalworking has established without contradiction that it was diligent and fully responsive to Brown's complaints of harassment. Metalworking was not negligent either in discovering or remedying the harassment.

Metalworking investigated each of Brown's complaints. In some instances – involving someone writing on his time card, taking his time card, placing clothes in front of his locker, writing on his locker, taking a lunch from a shared refrigerator, placing a dead mouse in his work boot, and kicking his locker – the instigator could

not be found. But after receiving complaints regarding horseplay, Metalworking met with all of the Indianapolis facility employees to discuss the fact that horseplay and destruction of personal property would not be tolerated. With respect to the salt bag incident, Metalworking also took prompt corrective action that was "reasonably likely to prevent the harassment from recurring." After investigating the incident, the company terminated Davis for his role. Metalworking also suspended, without pay, three other employees when the company learned that these employees had used racially inappropriate language. Metalworking also hired a diversity consulting firm to conduct diversity and sensitivity training for all of its employees and management personnel at the Indianapolis facility and provided Brown with a personal management liaison in order to report any other workplace harassment issues.

Because Metalworking responded reasonably to each of Brown's complaints of harassment, there is no basis for employer liability and Metalworking is entitled to summary judgment on Brown's hostile work environment claim.

### B. *Constructive Discharge*

Brown also alleges he was constructively discharged. The term "constructive discharge" refers to the situation in which an employee is not fired but quits due to circumstances in which the working conditions have made remaining with his employer simply intolerable. *Lindale v. Tokheim Corp.*, 145 F.3d 953 (7th Cir. 1998). In order to establish constructive discharge, the working conditions must be so intolerable that a reasonable person would have been compelled to resign, and the working conditions must be intolerable in a discriminatory way. *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996). There must be a causal relationship between the discrimination and the discharge. *See e.g., id.,* at 489; *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005-06 (7th Cir. 1994). Thus, no matter how "horrific the conditions," Brown must put forth evidence showing that the employment decision was the result of his age or race. *Vitug v. Multistate Tax Com'n,* 88 F.3d 506, 517 (7th Cir. 1996).

Metalworking has come forward with evidence that Brown was not constructively discharged. For example, as a result of the salt bag incident, Metalworking terminated Davis, eliminating any risk that Brown would be subjected to similar conduct from him, and conducted diversity training. In addition, Metalworking investigated each of Brown's complaints. Brown testified in his deposition that he resigned because someone was sabotaging his work by ruining his paint jobs. Brown reported these incidents to Guilfoy, who investigated his allegations but was unable to determine who was tampering with the paint jobs. Brown has not responded to the motion for summary judgment and therefore has not put forward any evidence that he was constructively discharged. He testified at his deposition that he did not know who was sabotaging his paint jobs and he presents no evidence that any sabotage was based on his race.

Metalworking investigated each of Brown's complaints and took corrective action when possible. Brown asserted in his deposition that he quit his job because someone was sabotaging his paint jobs, but he has no evidence that the sabotage of his paint jobs was based on his race. Under these circumstances, Brown has not established a constructive discharge claim and Metalworking is entitled to summary judgment on this claim.

## Conclusion

Metalworking's motion for summary judgment [43] is **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 11/13/12

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All electronically registered counsel

Zellner D. Brown III
1847 Venona Place
Indianapolis, IN 46232